UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| WAYNE ARNOLD,<br>Plaintiff,<br>v.<br>JOHNSON TRUCK BODIES, INC.,<br>Defendant. | Civil Action No. 07-373-ML |

**AFFIDAVIT OF ALFRED MILLER**

I, Alfred Miller, hereby declare and state as follows:

1. I am National Sales Manager for Johnson Truck Bodies, Inc. ("JTB"). I have personal knowledge of the facts set forth below.

2. JTB is a Delaware corporation based in Lake Rice, Wisconsin. JTB is engaged in the design and manufacture of custom engineered, high-quality molded fiberglass refrigerated truck bodies and trailers. The fiberglass truck body industry is very competitive.

3. The plaintiff in this lawsuit, Wayne Arnold, worked as a commissioned sales representative for JTB from December 5, 2003 until August 2007, when he resigned. As a sales representative, Arnold sold refrigerated truck bodies and trailers. He received a base salary as well as commissions on these sales. Arnold also received certain fringe benefits from JTB, including 401K w/ company contributions, health, dental, disability and life insurance, paid vacation, company car and all sales expenses.

4. From January 1, 2007 until August 23, 2007, when he resigned, Arnold earned compensation totaling approximately $80,000 from JTB. This works out to $10,000 per month.

Compensation of this magnitude is typical for someone with Arnold's experience in this industry.

5. JTB maintains certain customer files for the use of its sales staff. These files contain information concerning the identity of different customers, their contact information, the products they have purchased, and the prices they have paid for JTB products. The information in these files took an enormous amount of time and effort to compile, and is highly proprietary to JTB.

6. JTB gave Arnold unrestricted access to its customer files while he worked here. After he resigned, we asked Arnold to return the files. He has not done so. In fact, when Arnold returned the JTB laptop computer he had been using, the customer file information had been deleted.

7. After his resignation, JTB learned that Arnold had been hired as a sales representative – effective even before he resigned from JTB – by a company called Kidron, Inc. ("Kidron"). Kidron is a competitor of JTB. JTB immediately informed Kidron that Arnold had signed an agreement which prevented him from working for a company which competed against JTB. Shortly thereafter, Arnold's employment with Kidron ended.

8. I understand that Arnold is contending that the non-competition agreement he signed is unenforceable. If Arnold were permitted to ignore the restrictions contained in his non-competition agreement, JTB would face two kinds of competitive losses. First, by going to work as a sales representative for the competition, Arnold could easily divert business from JTB to his new employer. This could involve a substantial amount of money. For example, if Arnold succeeded in diverting only 10 moderate-size customers away from JTB, this would deprive JTB of revenues totaling $1,000,000 per year.

9. Exhibit A to this affidavit is concrete evidence of the damage Arnold could do to JTB were he permitted to ignore the restrictions contained in his non-competition agreement. Exhibit A was retrieved from the company computer Arnold returned to JTB when he resigned. (An attempt had been made to delete this document from Arnold's computer, but JTB was able to recover it anyway.) The document is a letter from Arnold to Kidron in which Arnold discusses his proposed compensation package with Kidron. Arnold declares in the letter that "I am presently working on over $1,000,000.00 in business that I would bring to Kidron." Because Arnold had not even begun working for Kidron at this point, it is obvious that the $1 million in business Arnold was working on were JTB customers. Thus, by Arnold's own admission, JTB stood to lose more than $1 million in business were Arnold permitted to work for a competitor.

10. Second, if Arnold made JTB's customer lists available to his new employer, this would be of great value to that company. Given the detailed information contained in the customer lists, and the tremendous amount of time and effort that went into finding and obtaining business from the customers identified on the lists, I estimate that one of our competitors would pay $10,000 to obtain those lists.

ALFRED MILLER

Subscribed and sworn to before me on the 9th day of November, 2007.

Notary Public
My Commission Expires: 1-13-2011



PRV 917510.1